No. 19-50529

# In the United States Court of Appeals for the Fifth Circuit

---

Speech First, Inc.,

*Plaintiff–Appellant*,

v.

Gregory L. Fenves, in his official capacity as President of the University of Texas at Austin,

*Defendant–Appellee*.

---

On Appeal from the United States District Court for the Western District of Texas, Austin Division, Case No. 1:18-cv-01078-LY

---

## Brief of Appellee Gregory L. Fenves

---

Charles L. Babcock
Joel R. Glover
Jackson Walker LLP
1401 McKinney Street, Suite 1900
Houston, Texas  77010
Telephone:  (713) 752-4200
Facsimile:  (713) 752-4221

Adam W. Aston
Jackson Walker LLP
100 Congress Ave., Suite 1100
Austin, Texas  78701
Telephone:  (512) 236-2000
Facsimile:  (512) 236-2002

Allyson N. Ho
Russell H. Falconer
Kathryn M. Cherry
Gibson, Dunn & Crutcher LLP
2100 McKinney Avenue, Suite 1100
Dallas, Texas  75201
Telephone:  (214) 698-3100
Facsimile:  (214) 571-2900

*Counsel for Defendant–Appellee*

CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| Plaintiff–Appellant | Counsel for Plaintiff–Appellant |
|---|---|
| Speech First, Inc. | William S. Consovoy<br>Jeffrey M. Harris<br>Cameron T. Norris<br>CONSOVOY MCCARTHY PLLC<br>1600 Wilson Boulevard, Suite 700<br>Arlington, Virginia  22209 |
| **Defendant–Appellee** | **Counsel for Defendant–Appellee** |
| Gregory L. Fenves, in his official capacity as President of the University of Texas at Austin | Allyson N. Ho<br>Russell H. Falconer<br>Kathryn M. Cherry<br>GIBSON, DUNN & CRUTCHER LLP<br>2100 McKinney Avenue, Suite 1100<br>Dallas, Texas  75201<br><br>Charles L. Babcock<br>Joel R. Glover<br>JACKSON WALKER LLP<br>1401 McKinney Street, Suite 1900<br>Houston, Texas  77010<br><br>Adam W. Aston<br>JACKSON WALKER LLP<br>100 Congress Ave., Suite 1100<br>Austin, Texas  78701 |

| Defendant–Appellee | Former Counsel for Defendant–Appellee |
|---|---|
| Gregory L. Fenves, in his official capacity as President of the University of Texas at Austin | The Honorable Sean D. Jordan<br>U.S. District Judge for the Eastern District of Texas<br>U.S. Courthouse, Suite 111<br>7940 Preston Road<br>Plano, Texas  75024 |

Respectfully submitted,

 /s/ *Allyson N. Ho*
Allyson N. Ho
*Counsel of Record*

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is unnecessary to affirm the judgment, which rests on well-settled principles of Article III standing faithfully applied to the facts of this case. Should the Court determine that oral argument would be helpful, President Fenves respectfully requests the opportunity to appear and present argument.

# TABLE OF CONTENTS

Page

Certificate of Interested Persons ................................................................ i

Statement Regarding Oral Argument ...................................................... iii

Table of Authorities ................................................................................ vi

Introduction ............................................................................................ 1

Issues Presented ...................................................................................... 3

Statement of the Case ............................................................................. 5

    I.    Statement Of Facts ........................................................................ 5

        A.    The University's Commitment To Free Speech .................... 5

        B.    The University's Policies ...................................................... 7

               1.    The Institutional Rules ................................................. 9

               2.    The Acceptable Use Policy .......................................... 12

               3.    The Residence Hall Manual ........................................ 14

               4.    The Campus Climate Response Team ......................... 15

    II.    Procedural History ...................................................................... 17

    III.  The University Amends Its Policies After A New State Law Converts Outdoor Campus Space To Traditional Public Forums ......................................................................................... 21

Standard of Review ................................................................................ 24

Summary of the Argument ..................................................................... 24

Argument ............................................................................................... 26

    I.    Speech First's Challenges To The Acceptable Use Policy And The Residence Hall Manual Are Moot ................................. 26

    II.    Speech First Lacks Standing ....................................................... 29

        A.    Speech First's Members Face No Credible Threat Of Prosecution ........................................................................ 32

               1.    There Is No History Of Past Enforcement ................. 32

# TABLE OF CONTENTS
## (continued)

Page

    2. The University's Policies Repeatedly Disavow Any Intention To Prosecute Students For The Speech In Which Speech First's Members Wish To Engage .........34

    3. The CCRT Is Not Process, Much Less Punishment .....36

    4. Speech First's Alternative Theories Of Standing Are Foreclosed ...............................................................43

  B. The Speech in Which Speech First's Members Wish To Engage Is Not Prohibited By The University's Policies .....47

III. The District Court Properly Dismissed The Complaint ............51

Conclusion ................................................................................... 54

Certificate of Service ................................................................. 56

Certificate of Compliance ......................................................... 56

Addendum ................................................................................... 57

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Abbott v. Pastides*,
900 F.3d 160 (4th Cir. 2018)........................................................ *passim*

*Am. Commc'ns Ass'n v. Douds*,
339 U.S. 382 (1950)..................................................................... 39

*Am. Library Ass'n v. Barr*,
956 F.2d 1178 (D.C. Cir. 1992).......................................... 43

*Babbitt v. United Farm Workers Nat'l Union*,
442 U.S. 289 (1979)............................................................ 44, 46

*Backpage.com, LLC v. Dart*,
807 F.3d 229 (7th Cir. 2015)............................................ 39

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963)............................................................ 39, 42

*Barber v. Bryant*,
860 F.3d 345 (5th Cir. 2017)............................................ 30

*Blum v. Holder*,
744 F.3d 790 (1st Cir. 2014) ............................. 33, 35, 36, 50

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)............................................................ 33, 35

*Cruz v. Abbott*,
849 F.3d 594 (5th Cir. 2017)............................................ 32, 50, 52

*Ctr. for Individual Freedom v. Carmouche*,
449 F.3d 655 (5th Cir. 2006)............................................ 33, 44

*Cutter v. Wilkinson*,
544 U.S. 709 (2005)............................................................ 51

*Flores v. Pompeo*,
936 F.3d 273 (5th Cir. 2019)............................................ 54

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Fontenot v. McCraw*,
   777 F.3d 741 (5th Cir. 2015)..............................................................26

*Freedom Path, Inc. v. IRS*,
   913 F.3d 503 (5th Cir. 2019)..............................................................30

*Glass v. Paxton*,
   900 F.3d 233 (5th Cir. 2018)..............................................24, 29, 43

*Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*,
   313 F.3d 305 (5th Cir. 2002)..............................................................51

*Hill v. City of Houston*,
   789 F.2d 1103 (5th Cir. 1986)............................................................33

*Hous. Chron. Pub. Co. v. City of League City*,
   488 F.3d 613 (5th Cir. 2007)..............................................................30

*Joint Heirs Fellowship Church v. Akin*,
   629 F. App'x 627 (5th Cir. 2015) ...........................................33, 36, 44

*Kitty Hawk Aircargo, Inc. v. Chao*,
   418 F.3d 453 (5th Cir. 2005)..............................................................23

*Kiyemba v. Obama*,
   559 U.S. 131 (2010)..............................................................................51

*Krim v. pcOrder.com, Inc.*,
   402 F.3d 489 (5th Cir. 2005)..............................................................54

*Kucel v. Walter E. Heller & Co.*,
   813 F.2d 67 (5th Cir. 1987)................................................................22

*Laird v. Tatum*,
   408 U.S. 1 (1972)..........................................................................31, 43

*Levin v. Harleston*,
   966 F.2d 85 (2d Cir. 1992) ................................................................42

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)......................................................................29, 34

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Moore v. Brown*,
    868 F.3d 398 (5th Cir. 2017) ....................................................... 24, 27

*Okpalobi v. Foster*,
    244 F.3d 405 (5th Cir. 2001) ............................................................. 53

*Okwendy v. Molinari*,
    333 F.3d 339 (2d Cir. 2003) ............................................................... 39

*Parsons v. DOJ*,
    801 F.3d 701 (6th Cir. 2015) ............................................................. 38

*Ramming v. United States*,
    281 F.3d 158 (5th Cir. 2001) ............................................................. 53

*Rangra v. Brown*,
    566 F.3d 515 (5th Cir. 2009), *vacated*,
    576 F.3d 531 (5th Cir. 2009) ............................................................. 45

*Rattner v. Netburn*,
    930 F.2d 204 (2d Cir. 1991) ............................................................... 38

*Shockley v. Jones*,
    823 F.2d 1068 (7th Cir. 1987) ...................................................... 51, 54

*Sossamon v. Texas*,
    560 F.3d 316 (5th Cir. 2009), *aff'd on other grounds*,
    563 U.S. 277 (2011) ........................................................................... 26

*Speech First, Inc. v. Schlissel*,
    —F.3d—,
    2019 WL 4582834 (6th Cir. Sept. 23, 2019) ...................... 29, 39, 40, 49

*Steffel v. Thompson*,
    415 U.S. 452 (1974) ........................................................................... 33

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ................................................................. *passim*

*Sweezy v. New Hampshire*,
    354 U.S. 234 (1957) ........................................................................... 41

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Townley v. Miller,*
  722 F.3d 1128 (9th Cir. 2013)..............................................................30

*U.S. Parole Comm'n v. Geraghty,*
  445 U.S. 388 (1980)............................................................................27

*United States v. Landaverde-Castillo,*
  731 F. App'x 293 (5th Cir. 2018) .........................................................47

*United States v. White,*
  258 F.3d 374 (5th Cir. 2001)...............................................................22

*White v. Lee,*
  227 F.3d 1214 (9th Cir. 2000)............................................................41

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008).................................................................................30

*Wollschlaeger v. Governor,*
  848 F.3d 1293 (11th Cir. 2017).........................................................48

*Younger v. Harris,*
  401 U.S. 37 (1971)..............................................................................46

*Zanders v. Swanson,*
  573 F.3d 591 (8th Cir. 2009)..............................................................50

*Zimmerman v. City of Austin,*
  881 F.3d 378 (5th Cir. 2018).....................................................20, 31

### Statutes & Rules

Fed. R. Civ. P. 12 .......................................................................52, 53, 54

Tex. Educ. Code § 51.9315............................................................*passim*

### Other Authorities

Act of June 10, 2019, 86th Leg., R.S., ch. 568
  (codified at Tex. Educ. Code § 51.3915) ............................................21

## TABLE OF AUTHORITIES
(continued)

Page(s)

Brief of Appellees Mark Schlissel et al.,
  *Speech First, Inc. v. Schlissel*, —F.3d—, 2019 WL 4582834
  (6th Cir. Sept. 23, 2019) (No. 18-1917),
  2018 WL 6738711 ................................................................................ 40

11A Charles Alan Wright et al.,
  *Federal Practice and Procedure* § 2950 (3d ed. 2019) ....................... 53

Gregory L. Fenves,
  *Speech and Expression On Campus*,
  Univ. of Tex. at Austin (Aug. 30, 2019) ................................................ 5

Kenneth Dautrich,
  *The Future of the First Amendment*,
  Knight Found. (Dec. 2018) ..................................................................... 1

*Longhorn Traditions*,
  Univ. of Tex. at Austin (2019) ................................................................ 5

## INTRODUCTION

Freedom of expression is essential for the University of Texas at Austin to carry out its educational mission—and the University is committed to robustly protecting every person's free-speech rights and fostering open debate and dialogue on campus. That is not easy in a time when only 45 percent of high school students believe that people have the right to speech that others consider offensive.[1] But it is a mission to which the University is unflaggingly committed. As its President, Greg Fenves, has made clear, "[f]ree speech is critical to the exchange of ideas that must happen at a university. We don't learn by quieting voices. We learn by listening to one another and, when we disagree, by engaging in thoughtful dialogue." ROA.632.

The University's policies repeatedly reinforce its commitment to the foundational principle that the remedy for speech with which one disagrees is more speech, not intimidation. The University strives to protect students' free-speech rights by reinforcing to everyone on campus the importance of those rights. And the University has intervened to

---

[1]   Kenneth Dautrich, *The Future of the First Amendment* 4, Knight Found. (Dec. 2018), https://kf-site-production.s3.amazonaws.com/media_elements/files/000/000/271/original/Knight-FoFA-HighSchool-18-v2.pdf.

prevent students from exercising the heckler's veto and interfering with speech they find objectionable.

As part of its commitment to ensuring the free exchange of ideas that is the bedrock of the University's educational mission, the University takes very seriously the concerns of students who feel pressured to stifle their speech or fearful about expressing their views. That is why the University's policies affirmatively *protect* and *encourage* the speech at issue in this case. That is why the University never has—and never will—punish or otherwise discipline a student for engaging in such speech. And that is why Speech First cannot show that its student-members are under any credible threat of punishment for engaging in such speech—and why the district court was right to dismiss this case for lack of standing.

## ISSUES PRESENTED

1.    While this appeal was pending, the University amended its policies in accordance with a new state law making the University's common outdoor areas a public forum for First Amendment purposes and requiring the University to "adopt a policy detailing students' rights and responsibilities regarding expressive activities at the institution."  As part of that process, the University removed two of the policies at issue in this appeal.  The University made these amendments in good faith and has no intention of reverting to the challenged provisions.  Are Speech First's challenges to these provisions moot?

2.    The speech in which Speech First's members want to engage is expressly protected by the University's policies.  And the University has never enforced or threatened to enforce its policies against such speech.  Do the University's policies objectively chill Speech First's members' speech such that Speech First has standing to bring a facial challenge against those policies?

3.    When the University's Campus Climate Response Team (CCRT) responds to a report of a campus climate incident, its exclusive focus is on providing support to the reporter of the incident.  The CCRT

does not contact or meet with the student who allegedly caused the incident. It does not investigate or discipline that student. And it does not publicly report any identifying information about that student. Is the CCRT's response a form of punishment for the student who allegedly caused the incident?

**STATEMENT OF THE CASE**

## I.    Statement Of Facts

### A.    The University's Commitment To Free Speech

The University's commitment to free speech and an open exchange of ideas is as much a part of its cherished traditions as Bevo (the longhorn steer mascot), "The Eyes of Texas" (first sung by the Longhorn faithful in 1903), and the "Hook 'em horns" sign. *Longhorn Traditions*, Univ. of Tex. at Austin (2019), https://www.utexas.edu/about/longhorn-traditions. "For generations, The University of Texas at Austin has thrived because of its commitment to free speech and an open exchange of ideas." Gregory L. Fenves, *Speech and Expression On Campus*, Univ. of Tex. at Austin (Aug. 30, 2019), https://president.utexas.edu/messages/speech-and-expression-on-campus-2019. "The University of Texas at Austin is a place for dialogue," where "all student organizations and individual students have a right to express their opinions on campus." ROA.697–98 (Moore Statement).

Testimony from some of the University's most senior leaders uniformly confirms that the tradition of protecting free speech and promoting the free exchange of ideas is ingrained in the fabric of the

University.  For example, Greg Fenves, President of the University, emphasized his "total and complete commitment to freedom of speech, assembly, and expression."  ROA.629.  President Fenves explained that he would not "tolerate any infringement of a student's exercise of his or her constitutionally protected free speech rights."  ROA.631.

Similarly, the Dean of Students—"the chief disciplinarian for students at the University"—testified that "[f]ree speech is fundamental to the learning process.  Our differences can be uncomfortable or even hurt, but that is how we learn and grow.  Freedom of speech is a fundamental right held by all members of the University community."  ROA.641–42.

The University's handling of student speech events further reflects its unflagging commitment to promoting free speech on campus.  For example, in 2018, when the Young Conservatives of Texas held an on-campus event supporting then-Judge Kavanaugh's nomination to the Supreme Court, the University ensured that the event went forward.  When a few counter-demonstrators disrupted the event they were detained and disciplined.  ROA.633, 706–07, 728, 731–32, 791–92.  *Cf.* Tex. Educ. Code § 51.9315(f)(2) (requiring universities to "establish

disciplinary sanctions for students, student organizations, or faculty who unduly interfere with the expressive activities of others on campus"). The Young Conservatives also held an "affirmative action bake sale" that "charged different prices based on the customer's race and sex." ROA.40. The bake sale resulted in no discipline to any students. ROA.706–08.

Conservative speaker Charlie Kirk hosted a "Change My Mind" challenge issued to students with opposing viewpoints. ROA.708. The University ensured that Mr. Kirk was able to engage in debate and dialogue with students who attended. ROA.692, 728–29. The only student disciplined in connection with the event was a student who tried to disrupt Mr. Kirk's speech. ROA.708.

In each case, the University took pains to ensure that students would be free to exercise their First Amendment rights, regardless of the content or viewpoint of their speech.

## B. The University's Policies

The University's commitment to free speech and the open exchange of ideas is reflected in the University's policies. This is true whether considering those previously in effect or those implemented to comply with a newly enacted state law. Like all institutions of higher education,

the University maintains a variety of policies that govern student life on campus.  The University's policies state, over and over again, that students enjoy full freedom on campus to voice their views and perspectives, no matter how unpopular or controversial those views and perspectives might be with other members of the University community. ROA.643.

Speech First challenges three of the University's policies and its Campus Climate Response Team:[2]

(1) ***The Institutional Rules:*** The Institutional Rules of Student Services and Activities and Information on Students' Rights and Responsibilities are the bedrock standards to which all University community members must adhere and the source for any disciplinary action for student conduct.  ROA.186–99.

(2) ***The Acceptable Use Policy:*** The Acceptable Use Policy outlines permitted and prohibited uses of the information technology devices and systems (such as computers and networks) provided and maintained by the University. ROA.201–17.

---

[2] The discussion of policies in this section relates to the previous policy versions in place before the change in state law.  As explained in more detail *infra* pp.20–22, after the district court issued its decision, the University amended several of the challenged policies in response to a state law enacted in June 2019, "deem[ing]" "the common outdoor areas of [an] institution's campus . . . traditional public forums," and requiring schools to adopt a policy detailing "students' rights and responsibilities regarding expressive activities at the institution."  Tex. Educ. Code § 51.9315(c)(1), (f) (effective Sept. 1, 2019).

8

(3) ***The Residence Hall Manual:*** The Residence Hall Manual explains how residents should conduct themselves inside the University's dormitories. ROA.219–94.

(4) ***The Campus Climate Response Team:*** The CCRT is not a policy, but a group of University administrators with whom students can discuss incidents of perceived bias on campus. ROA.299–300.

Each of the three policies includes express, robust protections for the exercise of free speech on campus.[3]

### 1.     The Institutional Rules

The Institutional Rules govern the interactions of the University's community members and establish rules of conduct that are enforced through the University's formal disciplinary process. ROA.641–42.[4] The

---

[3] ROA.188 (Institutional Rules) ("To make an argument for or against the substance of any political, religious, philosophical, ideological, or academic idea is not verbal harassment, even if some listeners are offended by the argument or idea."); ROA.204 (Use Policy) ("As an academic institution, we place great value on freedom of thought and expression. . . . We do not punish or prevent expression that may be offensive but that violates no specific law or university regulation."); ROA.262–63 (Residence Hall Manual) ("[T]he University encourages all members of its community to support the freedom of speech. Students are free to communicate their ideas vigorously; those who are exposed to such ideas, whether in the classroom, the grounds of the campus, or in the residence halls, should tolerate the expression even of views that they find offensive or unacceptable. Students who passionately disagree about important matters should be able to confront one another civilly and to recognize that, despite profound differences, they are engaged in the common pursuit of truth. The best response to offensive speech is more free speech.").

[4] The discussion in this section focuses on the version that was in effect until the 2019–20 school year.

rules on "Speech, Expression, and Assembly" begin with a section—entitled "Freedom of Speech, Expression, and Assembly"—that provides three important protections for the exercise of First Amendment rights. ROA.186.

*First*, the Rules reaffirm the University's commitment to the First Amendment and underscore that the "freedoms of speech, expression, and assembly are fundamental rights of all persons and are central to the mission of the University." ROA.186.

*Second*, the Rules acknowledge that all members of the University community are entitled to broad latitude in exercising those freedoms—"to express their views, individually or in organized groups, orally or in writing or by other symbols, on any topic, in all parts of the campus, subject only to rules necessary to preserve the equal rights of others and the other functions of the University." ROA.186.

*Third*, the Rules provide that the University "will not discriminate" against speech "on the basis of the political, religious, philosophical, ideological, or academic viewpoint expressed by any person, either in the enforcement and administration of these rules or otherwise." ROA.186.

The Rules also set out the University's prohibitions against engaging in unprotected forms of speech and conduct. In addition to prohibiting obscenity, defamation, and incitement to lawless action, ROA.187, the Rules prohibit verbal harassment: "No person will make, distribute, or display on the campus any statement that constitutes verbal harassment of any other person." ROA.188. "Verbal harassment" is narrowly defined:

1.  "Verbal harassment" means hostile or offensive speech, oral, written, or symbolic, that

    A.  is not necessary to the expression of any idea described in subsection 13–204(b)(2) [which explains that "an argument for or against the substance of any political, religious, philosophical, ideological, or academic idea is not verbal harassment, even if some listeners are offended by the argument or idea"];

    B.  is sufficiently severe, pervasive, or persistent to create an objectively hostile environment that interferes with or diminishes the victim's ability to participate in or benefit from the services, activities, or privileges provided by the University; *and*

    C.  personally describes or is personally directed to one or more specific individuals.

ROA.188 (emphasis added). The limitation in (1)(A) explicitly excludes core First Amendment speech—speech on matters of intellectual and public concern—from the definition of verbal harassment.

11

The Rules contain two additional limitations on the definition of "verbal harassment" that further narrow its scope.  First, the Rules clarify that provisions encouraging students to "learn to separate substantive argument from personal offense" and "express even the deepest disagreements within standards of civility that reflect mutual respect, understanding, and sensitivity" are "community norms" that "cannot be enforced by disciplinary rules."  ROA.188.  Second, the Rules put students on notice that "[v]erbal harassment has been interpreted very narrowly by the federal courts" and that the Rules' definition of verbal harassment "should be interpreted as narrowly as need be to preserve its constitutionality."  ROA.188.

### 2.    The Acceptable Use Policy

The Acceptable Use Policy "establishes guidelines for acceptable use of information resources."  ROA.202.  The policy affirms that "[a]s an academic institution, [the University] place[s] great value on freedom of thought and expression."  ROA.204.  And it reiterates that "[i]n general, expressions of opinion by members of the university community that do not otherwise violate state and federal laws or university rules are

protected as 'free speech.' This is true even though the opinions expressed may be unpopular or offensive to some." ROA.212.

Along with prohibitions on copyright infringement, computer network attacks, and other misuses of the University's network, the policy contains provisions that address online harassment. Those provisions make clear that University students can be subject to discipline for online harassment only if their conduct violates the Institutional Rules' prohibition against verbal harassment. ROA.202.

The policy encourages students to "be civil" and to "not send rude or harassing correspondence." ROA.208. It advises that "[i]f someone asks you to stop communicating with him or her, you should." ROA.208. "If you fail to do so, the person can file a complaint and you can be disciplined." ROA.208. But the policy's request for civility is subject to important limitations.

A section entitled "What are my First Amendment rights" makes clear that the University "place[s] great value on freedom of thought and expression." ROA.204. Because the University "community encompasses a wide array of opinions, views, approaches, and temperaments," it does "not punish or prevent expression that may be

13

offensive but that violates no specific law or university regulation."
ROA.204.  Further, "[d]isagreements between people, even heated
arguments, unless threatening or otherwise unlawful, are not considered
violations" of the policy and cannot result in University discipline.
ROA.213.

So too with the policy's plea to "be civil" and to "express even the
deepest disagreements within standards of civility"—these are
"community norms" that "cannot be enforced by disciplinary rules."
ROA.188, 208.

### 3.    The Residence Hall Manual

The manual lays out the "rules and regulations" governing student
life in the University's residence halls.  ROA.220.  It re-affirms that "the
University encourages all members of its community to support the
freedom of speech" and calls on students to "tolerate the expression even
of views that they find offensive or unacceptable" because "[t]he best
response to offensive speech is more free speech."  ROA.262–63.

The manual states that "[m]embers of an educational community
should adhere to standards of civility and good taste that reflect mutual
respect."  ROA.243.  It makes clear that "it is the policy of the University

to maintain an educational environment free from harassment and intimidation." ROA.243. But it also makes clear that students can be subject to discipline only for engaging in conduct that violates the Institutional Rules. ROA.243.

The manual underscores that "[s]tudents are free to communicate their ideas vigorously; those who are exposed to such ideas, whether in the classroom, the grounds of the campus, or in the residence halls, should tolerate the expression even of views that they find offensive or unacceptable." ROA.262–63. What's more, "[s]tudents who passionately disagree about important matters should be able to confront one another civilly"—the "best response to offensive speech is more free speech." ROA.263.

### 4.    The Campus Climate Response Team

The Campus Climate Response Team (CCRT) serves as "a coordinated point of contact where perceived bias incidents . . . can be reported to the University." ROA.716. Students "who believe they have been discriminated against" or "have experienced threatened or actual violence on the basis of" bias can report the incident to the CCRT. ROA.300.

As University administrator Edna Dominguez explained in her declaration, when a student submits a report, the CCRT "serves two limited functions." ROA.716. First, the CCRT provides support by "shar[ing] with the reporter of a perceived bias incident University resources that may be available to him or her." ROA.716–17. Second, the CCRT gathers information by "collat[ing] the data reported to it" to include in a yearly report. *E.g.*, ROA.329–51.

Perhaps more important is what the CCRT does *not* do. It does not punish, discipline, or even investigate University students: "The CCRT has no disciplinary authority; it is not an adjudicatory body; and it does not conduct (and has no authority to conduct) investigations into alleged student misconduct." ROA.717; *see also* ROA.522 (district court finding that the CCRT "does not engage in investigations or punishment of any sort"). It does not "contact any student who allegedly caused an incident," and "it does not investigate a [r]eport." ROA.717. As a result, "no student at the University has been investigated or punished by the CCRT for

engaging in speech or expression protected by the First Amendment." ROA.719.[5]

The CCRT's lack of investigatory and disciplinary authority is no secret. As the district court found, the CCRT's website "makes clear that it is a 'non-adjudicating body' that 'support[s] reporters of bias incidents and [ ] provide[s] information regarding university resources.'" ROA.514 (first and last alterations in original); *see also* ROA.356, 385, 388, 396.

## II.  Procedural History

Speech First filed this suit against the University on behalf of three anonymous students—Students A, B, and C—who wish to express "unpopular" and "minority" views about various issues, including immigration, abortion, affirmative action, the Second Amendment, the Supreme Court, and the #MeToo Movement. ROA.42–44. Speech First's pleadings referred to Students A, B and C, but the declaration of Speech First's President in support of its motion for a preliminary injunction did not mention them or specify precisely what its student-members intended to say beyond listing general categories of speech. ROA.181–82.

---

[5]  Speech First's contrary representations in its brief are thus inconsistent with the record. Speech First Br. 20–21, 42–44.

Speech First contends that expressing these views could be deemed "offensive" (under the Institutional Rules), "harassing" (under the Institutional Rules and the Use Policy), "rude" (under the Use Policy), or "uncivil" (under the Use Policy and the Residence Hall Manual)—"thus risking investigation and formal or informal punishment" by the University. ROA.509.

Speech First further contends that expressing these views could "trigger[] an investigation by the Campus Climate Response Team," which could result in "formal or informal punishment." ROA.509 (expressing these views "could result in an accusation of a 'bias incident' or 'campus climate incident'").

Speech First does not claim that any of its members have ever been investigated or disciplined for exercising their free speech rights. Instead, Speech First brings a facial First Amendment challenge to the University's policies as overbroad and vague. ROA.509. Nor does Speech First allege that any of its members have actually expressed any of their "unpopular" or "minority" views on campus. But Speech First contends that it has standing to challenge the University's policies because those policies chill its members' speech. ROA.509.

Speech First sought a preliminary injunction to enjoin the University from (1) taking any action to investigate, threaten, or punish students for violating prohibitions on "verbal harassment," "incivility," "harassment," "intimidation," or "rudeness" found in the Institutional Rules, the Residence Hall Manual, and the Acceptable Use Policy, and (2) using the CCRT to investigate, log, threaten, or punish students for "bias incidents" or "campus climate incidents." ROA.510.

After full briefing, the district court held a hearing on Speech First's motion for a preliminary injunction. When asked why the preliminary injunction hearing had not been consolidated into a hearing on the merits, Speech First acknowledged that "quite a bit of what we say as a matter of law could be decided. There's not much more factual development you need to determine the constitutionality of these policies and our standing." ROA.531. Consistent with that representation, the only issue Speech First identified for the district court as potentially warranting "some limited discovery" was if there were not "enough information about what the CCRT actually does, some other facts about what's actually happening on campus." ROA.531.

The district court denied Speech First's request for a preliminary injunction and dismissed its complaint without prejudice for lack of standing. The district court rejected Speech First's contention that "the mere existence of an allegedly vague or overbroad statute is an injury in itself." ROA.517. Instead, the court explained, standing to bring a pre-enforcement challenge requires "evidence of [1] an intention to engage in a course of conduct arguably affected with a constitutional interest, but [2] proscribed by statute . . . [and] [3] a credible threat of prosecution." ROA.517–18 (quotation marks omitted) (quoting *Zimmerman v. City of Austin*, 881 F.3d 378, 391 (5th Cir. 2018)).

The district court concluded that Speech First had not established those elements. First, the court found that "Speech First offers no more than generalized declarations of broad categories of speech in which" its student members wish to engage. ROA.521. Second, it determined that none of the topics or issues that Speech First's student-members wish to discuss—"affirmative action, the #MeToo movement, President Trump, immigration, Justice Kavanaugh, and the Second Amendment"—is prohibited by any of the challenged policies. ROA.521. Third, it found "no evidence that the University has punished students for violating the

Institutional Rules, the Residence Hall Manual, or the Acceptable Use Policy" and no evidence that the CCRT has ever investigated or punished—or even has the authority to investigate or punish—any student at the University.  ROA.522.

Accordingly, the court ruled that Speech First lacked standing because it had not established that its members' speech rights were objectively chilled.  ROA.522–23.[6]

## III. The University Amends Its Policies After A New State Law Converts Outdoor Campus Space To Traditional Public Forums

About a week after the district court issued its opinion, Texas Governor Greg Abbott signed into law Senate Bill 18, which guarantees that members of the public are free to engage in expressive speech on public university campuses in Texas by deeming them (in large part) public forums.  Tex. Educ. Code § 51.9315(c)–(j) (effective Sept. 1, 2019); *see* Act of June 10, 2019 §§ 2, 4, 86th Leg., R.S., ch. 568 (codified at Tex.

---

[6] Speech First mistakenly asserts on appeal that apart from its arguments challenging standing, the University did not defend the language of any of the policies except for the verbal harassment policy.  Speech First Br. 21, 46.  In reality, the University defended the terms of the Acceptable Use Policy, the Residence Hall Manual, and the CCRT below on the merits, explaining that key provisions assure students that their speech is protected and that the policies were not overbroad. ROA.450–52.

Educ. Code § 51.9315), https://capitol.texas.gov/tlodocs/86R/billtext/pdf/
SB00018F.pdf.[7]  It also contains various requirements and prohibitions
related to expressive activities on campuses.

While the main effect of the new law is to allow any person to
engage in free-speech activities in the common outdoor areas of Texas's
public university campuses, Tex. Educ. Code § 51.9315(c), it also allows
universities to continue to regulate the time, place and manner of free
speech activities—so long as these rules are narrowly tailored, content-
neutral, and applied regardless of a speaker's viewpoint.  Tex. Educ. Code
§ 51.9315(d).  And it requires each university to "adopt a policy detailing
students' rights and responsibilities regarding expressive activities at the
institution."  Tex. Educ. Code § 51.9315(f).  The university's "policy
must":

   (1)  Allow "any person" to "engage in expressive activities on
       campus";

   (2)  "[E]stablish disciplinary sanctions for students, student
       organizations, or faculty who unduly interfere with the
       expressive activities of others on campus";

---

[7] "[F]ederal courts are required to take judicial notice of the content of the laws of
every state in the Union." *Kucel v. Walter E. Heller & Co.*, 813 F.2d 67, 74 (5th Cir.
1987); *see United States v. White*, 258 F.3d 374, 382 n.9 (5th Cir. 2001) ("We take
judicial notice of Texas law.").

(3) "[I]nclude a grievance procedure for addressing complaints";

(4) "[B]e approved by a majority vote of the institution's governing board before final adoption"; and

(5) "[B]e posted on the institution's Internet website."

Tex. Educ. Code § 51.9315(f).

Pursuant to Senate Bill 18, at the end of August the University issued policies and procedures that will be finalized and recommended for approval by The University of Texas System Board of Regents in 2020. Tex. Educ. Code § 51.9315(f)(4) (requiring approval by the governing board). As part of that process, the University consolidated and revised its policies governing expressive activities in time for the 2019–20 school year. These revisions include changes to three of the policies at issue in this appeal.

The revisions eliminate the language in the Use Policy and the Residence Hall Manual that Speech First takes issue with.[8] They also

---

[8] The amended Use Policy is available at https://security.utexas.edu/policies/aup (Add. B). The new Residence Hall Manual is available at http://housing.utexas.edu /sites/default/files/ResidenceHallManual_8292019.pdf (Add. C). *See Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 457 (5th Cir. 2005) (taking judicial notice of documents available on government website).

eliminate some of the challenged language in the Institutional Rules' verbal harassment policy.[9]  The revisions do not affect the CCRT.

## STANDARD OF REVIEW

This Court reviews "a district court's denial of a preliminary injunction for an abuse of discretion." *Moore v. Brown*, 868 F.3d 398, 402 (5th Cir. 2017).  "Factual findings are reviewed for clear error, while legal conclusions are reviewed de novo." *Id.* at 403.  A district court's dismissal for lack of standing is reviewed *de novo*.  *Glass v. Paxton*, 900 F.3d 233, 237 (5th Cir. 2018).

## SUMMARY OF THE ARGUMENT

The district court correctly concluded that Speech First lacks standing and properly dismissed this case without prejudice.  Speech First cannot establish standing because it cannot make an objective showing that its members' speech has been chilled by the policies it seeks to challenge—and that problem is incurable.

**I.**    Several of Speech First's claims have become moot on appeal. The University recently made amendments to the Use Policy and the

---

[9]  The amended Institutional Rules are available at https://catalog.utexas.edu /general-information/appendices/appendix-c/speech-expression-and-assembly (Add. A).

Residence Hall Manual that removed the provisions and language in those policies that Speech First challenged in its complaint. The University updated its policies in good faith and to comply with state law, and it affirmatively states that it has no intention of repealing the amendments. Accordingly, Speech First's complaints about the Use Policy and the Residence Hall Manual are moot.

**II.**  Speech First lacks standing because it cannot show that its members' speech has been objectively chilled by the policies it wishes to challenge. First, and most critically, there is no credible threat of enforcement. There is no history of enforcement (or even threatened enforcement) against *any* student—let alone any Speech First members. In all events, Speech First cannot show that the University's policies even arguably prohibit any of the speech in which its members wish to engage. Indeed, such speech is explicitly excluded from the policies' prohibitions.

Speech First concedes—as it must—that the CCRT has no authority to discipline or punish any student. Nor is the CCRT "process" a "punishment," because it is no "process" at all. The CCRT does not conduct investigations, and it neither contacts nor meets with any student other than the student who reports an incident.

**III.** The district court was correct to dismiss Speech First's complaint. Dismissal is appropriate whenever a federal court determines that it lacks subject matter jurisdiction, and the jurisdictional defects the district court correctly identified were incurable.

ARGUMENT

## I.    Speech First's Challenges To The Acceptable Use Policy And The Residence Hall Manual Are Moot

Speech First's challenges to the Use Policy and Residence Hall Manual are focused exclusively on language that was eliminated by the University's recent revisions to its policies governing expressive activities. *See* ROA.49–51 (Compl. III–VI). Because a court cannot enjoin the enforcement of policies that no longer exist, Speech First's challenges to these policies are moot.[10]

"[A]ny set of circumstances that eliminates actual controversy after the commencement of a lawsuit" generally "renders that action moot," *Fontenot v. McCraw*, 777 F.3d 741, 747 (5th Cir. 2015)—including

---

[10] This Court accords government entities—like the University—special solicitude when they formally change policies during the course of litigation. *Sossamon v. Texas*, 560 F.3d 316, 325 (5th Cir. 2009) (government is "accorded a presumption of good faith because [it is a] public servant[], not [a] self-interested private part[y]"), *aff'd on other grounds*, 563 U.S. 277 (2011).

26

changes to a policy being challenged on First Amendment grounds. *See*, *e.g.*, *Moore*, 868 F.3d at 407. Mootness is "standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980).

To begin, Counts III and IV of Speech First's complaint focus solely on language in the 2018–19 Use Policy that is no longer there. ROA.49–50. Specifically, the complaint targets language encouraging students to "[b]e civil," and "not send rude or harassing correspondence" without defining those terms. ROA.49–50. That language now has been removed from the Use Policy—the terms "civil," "rude," and "harassing" no longer appear anywhere in it. *Compare* ROA.201–17 (old Use Policy), *with* current Use Policy, https://security.utexas.edu/policies/aup. As a result, Counts III and IV of the complaint—which focus exclusively on the use of these terms—are moot.

So too with Counts V and VI of the complaint, which focus on language in the Residence Hall Manual. ROA.50–51. Those Counts challenge (1) language in the "Harassment" provision prohibiting certain kinds of harassment, intimidation, and verbal abuse; and (2) language in

the "Civility" provision prohibiting "[u]ncivil behaviors and language." ROA.50–51. None of the complained-of language remains. *Compare* ROA.243–94 (old Residence Hall Manual), *with* current Residence Hall Manual, http://housing.utexas.edu/sites/default/files/ResidenceHallManual _8292019.pdf. Counts V and VI are moot, too.

Count I of the complaint—which challenges the Institutional Rules' definition of verbal harassment—is moot in part. ROA.45–47. Paragraph 124 of Count I attacks that definition as overbroad because it provides that verbal harassment must be "severe, pervasive, or persistent." ROA.46–47. The amended Institutional Rules require verbal harassment to be "severe, pervasive, and objectively offensive." *See* https://catalog.utexas.edu/general-information/appendices/appendix-c /speech-expression-and-assembly (Add. A).

The amended Rules also limit verbal harassment to only "hostile or threatening conduct or speech." Compare *id.*, *with* ROA.188 ("'Verbal harassment' means hostile or offensive speech."). These changes make it even clearer that the Rule does not prohibit speech protected by the First Amendment: Speech that is merely offensive, but neither hostile nor threatening, does *not* constitute verbal harassment. Nor does hostile or

threatening speech constitute harassment unless it is severe *and* pervasive *and* objectively offensive—speech that is merely isolated or subjectively offensive is not verbal harassment. Accordingly, those portions of Count I based on the previous definition of "verbal harassment" are also moot.[11]

In sum, Speech First's challenges to the Use Policy and the Residence Hall Manual (encompassed in Counts III–VI of its complaint), and portions of its challenge to the Institution Rules' definition of verbal harassment (Count I), should be dismissed as moot.

## II.    Speech First Lacks Standing

To have associational standing to pursue its First Amendment, pre-enforcement facial challenge, Speech First must show that its members are suffering an injury-in-fact that is fairly traceable to the University's challenged policies and that can be redressed by a favorable decision. *See, e.g.*, *Glass*, 900 F.3d at 238. These requirements are the "irreducible constitutional minimum of standing." *Lujan v. Defenders of Wildlife*, 504

---

[11] The University has no plans to, and will not, reenact the former policies. *Compare Speech First, Inc. v. Schlissel*, —F.3d—, 2019 WL 4582834, at *8 (6th Cir. Sept. 23, 2019) (First Amendment challenge to university policies not moot where the university had "not affirmatively stated that it does not intend to reenact the challenged" policies).

U.S. 555, 560 (1992). They "retain[] rigor" even when "a plaintiff mounts a facial First Amendment challenge." *Freedom Path, Inc. v. IRS*, 913 F.3d 503, 507 (5th Cir. 2019).

Moreover—and contrary to Speech First's argument (at 22–23)—the fact that Speech First sought a preliminary injunction does not lower its burden to prove standing:  "Because a preliminary injunction 'may only be awarded upon a clear showing that the plaintiff is entitled to such relief,' the plaintiffs must make a '*clear showing*' that they have standing to maintain the preliminary injunction." *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017) (emphasis added) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008), and citing *Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013) ("At the preliminary injunction stage, plaintiffs must make a clear showing of each element of standing.")). Regardless, Speech First cannot carry even that lighter burden.

Speech First's primary argument (at 23–24) is that its members have suffered an injury-in-fact because the University's policies objectively chill its members' speech. *See Hous. Chron. Pub. Co. v. City of League City*, 488 F.3d 613, 618–19 (5th Cir. 2007) (to have standing plaintiff must show a "specific present *objective* harm or a threat of

specific future harm"—a "mere subjective chill" is insufficient) (emphasis added) (quoting *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972)).

To demonstrate an objective chilling of speech sufficient to establish injury-in-fact, Speech First must show that its members face "a credible threat of prosecution." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014); *see Abbott v. Pastides*, 900 F.3d 160, 167 (4th Cir. 2018) ("a credible threat of enforcement is critical; without one, a putative plaintiff can establish neither a realistic threat of legal sanction if he engaged in the speech in question, nor an objectively good reason for refraining from speaking and 'self-censoring' instead"). Speech First must also show that the speech in which its members wish to engage is prohibited by the University policies it is challenging. Speech First did not carry its burden on either element—nor could it.[12]

---

[12] Speech First also cannot satisfy the third element—that the plaintiff intends to engage in protected speech—because "Speech First provide[d] no supporting affidavits from Students A, B, or C about any specific statements they wish to make." ROA.520–21 (Speech First made only "generalized allegations and declaration of the speech in which Students A, B, and C generally wish to engage"); *see also Zimmerman*, 881 F.3d at 389 (plaintiff must have "concrete plans" or "objective evidence" demonstrating intent to engage in protected speech).

## A.    Speech First's Members Face No Credible Threat Of Prosecution

Most important, Speech First cannot show that its members face a credible threat of prosecution or enforcement under any of the policies at issue.  *See Cruz v. Abbott*, 849 F.3d 594, 599, 602 (5th Cir. 2017) (reversing grant of preliminary injunction and dismissing for want of jurisdiction—in a case where "standing [wa]s reduced to a question of statutory interpretation"—because "plaintiffs cannot demonstrate a credible threat of prosecution"); *see also Abbott*, 900 F.3d at 176 ("a credible threat of enforcement is critical").   Federal courts have considered various factors in assessing whether a plaintiff faces a credible threat—and here, all point toward the absence of a credible threat.  What's more, Speech First's contention that the CCRT's response to campus climate incidents is a form of informal discipline rests on a serious misunderstanding of what the CCRT actually does.

### 1.    There Is No History Of Past Enforcement

A "history of past enforcement" is "good evidence" of a credible threat of future enforcement.  *Susan B. Anthony List*, 573 U.S. at 164. This includes "situations in which the [policy] has already been enforced against a plaintiff," and enforcement actions against other parties who

engaged in similar conduct or expression. *Joint Heirs Fellowship Church v. Akin*, 629 F. App'x 627, 631 (5th Cir. 2015) (citing *Hill v. City of Houston*, 789 F.2d 1103, 1107 (5th Cir. 1986), and *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 660–61 (5th Cir. 2006)); *see also Steffel v. Thompson*, 415 U.S. 452, 455–56 (1974).

Conversely, the absence of any enforcement under similar circumstances in the past weighs strongly *against* any finding of a credible threat of enforcement in the future. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411 (2013) (plaintiffs' failure "to offer any evidence that" the statute had been applied to them in the past "substantially undermine[d] their standing theory"); *Blum v. Holder*, 744 F.3d 790, 799 (1st Cir. 2014) (plaintiffs could not show a credible threat of prosecution where prosecutions under the statute had "been rare and ha[d] addressed actions taken that are different from those plaintiffs propose to undertake").

Here, there is no evidence of any history of the Rules being enforced against Speech First, its members, other organizations, or other students similarly situated to Speech First's members. As the party invoking federal jurisdiction and seeking preliminary injunctive relief, Speech

First has the burden to adduce evidence sufficient to establish its standing. *See Lujan*, 504 U.S. at 561. Yet Speech First introduced no evidence that the University has *ever* enforced the Institutional Rules' verbal-harassment policy against any student for the speech in which Speech First's student members say they wish to engage. And the University introduced unrebutted evidence that it has never done so.[13]

### 2. The University's Policies Repeatedly Disavow Any Intention To Prosecute Students For The Speech In Which Speech First's Members Wish To Engage

The plain text of the challenged policies makes clear that none of the challenged policies—including the verbal-harassment rule, which is the only rule still in effect—prohibits any constitutionally protected speech in general, and the types of speech in which Speech First's members wish to engage in particular. Speech First's members "wish to express unpopular viewpoints about pressing issues of the day,"

---

[13]   *See* ROA.631 (President Fenves decl.) ("Until this current academic year, I was the final arbiter for certain types of student conduct cases. I can say categorically that in applying the University's rules, I personally know of no incident where a student has ever been investigated for the content of speech protected by the First Amendment to the United States Constitution."); ROA.642 (Dean of Students Dr. Reagins-Lilly decl.) ("During my tenure as Dean of Students, no student has been sanctioned for the content of their speech."); ROA.691 (official University statement that "[t]he University does not and will not take any punitive action against an organization or its members for exercising their constitutional right to free speech").

ROA.509—quintessential political and ideological ideas. The Institutional Rules categorically and explicitly exclude "the expression of any idea . . . for or against the substance of any political, religious, philosophical, ideological, or academic idea" from the definition of "verbal harassment." ROA.188.

In addition, the verbal harassment policy makes clear that "[v]erbal harassment has been interpreted very narrowly by the federal courts" and that the University's "policy should be interpreted as narrowly as need be to preserve its constitutionality." ROA.188. Where, as here, "the challenged [policy] contains . . . explicit rules of construction protecting First Amendment rights," courts routinely recognize that any threat of future prosecution is substantially reduced. *Blum*, 744 F.3d at 798; *see Abbott*, 900 F.3d at 177 (policy's express disclaimer "that the policy does not regulate academic speech" undermines the credibility of allegation that policy will be applied to academic speech); *see also Clapper*, 568 U.S. at 406 n.3 (relying on the specific rules of construction contained in the statute to find lack of an impending injury).

The unrebutted testimony of University leadership confirms what the language of the challenged policies makes plain and what the history

of non-enforcement underscores: the University has no intention of punishing the speech in which Speech First's members wish to engage. President Fenves, for example, will not "tolerate any infringement of a student's exercise of his or her constitutionally protected free speech rights." ROA.631. Other University officials have echoed President Fenves in disclaiming any intention of ever imposing discipline on a student for engaging in activity protected by the First Amendment. *E.g.*, ROA.641–42 (Dean of Students Dr. Reagins-Lilly); ROA.691 (official University press statement).[14]

### 3.   The CCRT Is Not Process, Much Less Punishment

Speech First concedes (at 21) that the CCRT has no authority to investigate or discipline students in response to a report. Instead, Speech First characterizes the CCRT as "a process-is-punishment mechanism" that deters people from speaking out. *Id.* (quotation marks omitted).[15]

---

[14] "Particular weight must be given to the [University's] disavowal of any intention to [punish]" the proposed conduct. *Blum*, 744 F.3d at 798 (no credible threat of enforcement where the "[g]overnment has affirmatively represented that it does not intend to prosecute such conduct"); *Joint Heirs*, 629 F. App'x at 631–32 (no credible threat of enforcement where the government "consistently proclaimed that it will not enforce [the statute] to prohibit the [plaintiffs'] proposed activities").

[15] Speech First is forced to rely on this "process-is-punishment" formulation because "enforcement" in this context typically refers to formal enforcement and prosecution. *See Abbott,* 900 F.3d at 178. An administrative process that does not culminate in formal enforcement constitutes an independent form of enforcement

But that characterization rests on a series of misunderstandings about the CCRT's authority and what it actually does.

At various points in its brief, Speech First mistakenly asserts that the CCRT "meets with perpetrators" (at 41); that the CCRT's "university administrators, including police officers and disciplinarians . . . contact students in that capacity" (at 41); that it "logs bias incidents on its website for the world to see, with enough information that anyone who is plugged in to campus gossip could identify the perpetrator" (at 43); that the reports make it easy to "identify the perpetrator" and "forever label students with the scarlet letter of 'bias offender'" (at 43); that the CCRT "can ask to meet with the accused student" (at 43); that the University "*requires* [students] to attend" meetings with the CCRT (at 43–44); that "bias incidents" are "a formal rule" (at 41); that "offender" is a definition that is *applied* to students (at 41); and that "a multi-step administrative process" begins when "the CCRT (or any individual student) concludes that speech is 'biased'" (at 40).

---

only if it is significantly "burdensome" for the "target" of the process. *See Susan B. Anthony List*, 573 U.S. at 165–66.

Each of these assertions is demonstrably mistaken.  Most crucially, the CCRT does not meet with or otherwise contact alleged perpetrators— nor does it have the power to do so.  Alleged perpetrators are not involved in any way with the CCRT's response—nor does it publicly disclose information about them.  Instead, the unrebutted, undisputed evidence establishes that the CCRT:

- Does *not* contact students alleged to have caused a campus climate incident.  ROA.717.

- Speaks *only* to the reporter of the incident.  ROA.717; *see* ROA.356–96.

- Does *not* (and has no authority to) conduct investigations into alleged student misconduct.  ROA.717.

- Creates a list that gives no name, no demographic information, and no other information about the student who is alleged to have caused the incident (or the reporter).  ROA.356–96.[16]

- May refer matters to university administrators or the police—who conduct an independent assessment—*if* the CCRT believes that the alleged perpetrator broke the law or violated the University's Institutional Rules.  ROA.385, 396; *see also* ROA.717–18.

---

[16]  This aspect of the CCRT distinguishes Speech First's cases in which government authorities misidentified innocent parties, either intentionally or unintentionally, with significant consequences for those parties.  *See* Speech First Br. 43 (citing *Parsons v. DOJ*, 801 F.3d 701, 712 (6th Cir. 2015) (Department of Justice misclassified a music group as a criminal gang), and *Rattner v. Netburn*, 930 F.2d 204, 210 (2d Cir. 1991) (town created a "McCarthyis[t]" list of businesses to boycott)).

The fact that the CCRT is not authorized to, and does not, contact or meet with alleged perpetrators is critical and distinguishes this case from those Speech First cites where government authorities did make contact (often accompanied by threats) with perpetrators.[17] The absence of any contact—voluntary or otherwise—with alleged perpetrators is also a key point of distinction with the Sixth Circuit's recent decision in *Schlissel*, where the Sixth Circuit was troubled by the coercive nature of the purportedly "voluntary" meetings in that case. 2019 WL 4582834, at *7–8 ("[T]he invitation from the Response Team to meet could carry an implicit threat of consequence should a student decline the invitation. . . . the invitation to meet with the students objectively chill[s] speech.").[18]

---

[17] *See Backpage.com, LLC v. Dart*, 807 F.3d 229, 230–32 (7th Cir. 2015) (sheriff used official letterhead and signature to "ask" credit card companies to boycott website); *Okwendy v. Molinari*, 333 F.3d 339, 340–42 (2d Cir. 2003) (Staten Island Borough president insinuated to billboard company that it could harm its business if it kept up billboard); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 60–63, 72 (1963) ("Commission to Encourage Morality in Youth" informed publishers that it could circulate lists of publishers to local police departments); *Am. Commc'ns Ass'n v. Douds*, 339 U.S. 382, 402 (1950) (law forbidding Communists from serving as heads of labor unions).

[18] The CCRT lacks other characteristics that the *Schlissel* court deemed relevant to its standing analysis. The CCRT does not possess the power to initiate investigations at all—much less without the reporting student's consent. *Compare* ROA.717, *with Schlissel*, 2019 WL 4582834, at *4–5. By contrast, the *Schlissel* "Bias Response Team" "follow[ed] a similar procedure following each report" of contacting the alleged instigator and asking that person to meet with a member of the Response Team "[i]f the reporting individual wishes," regardless of the merits of the complaint.

In contrast, this is not a process-as-punishment case because the CCRT's activities do not rise to the level of being a process—let alone a punishment. Even if the CCRT were authorized to engage with the alleged perpetrators, Speech First itself acknowledged below that such conduct still would not be so onerous as to qualify as punishment. ROA.602 (Hr'g Tr.) (Speech First's counsel) ("That"—the *Abbott* fact pattern of "call[ing] in some students for a meeting, [telling] the students they are not in trouble, and then let[ting] the students go"—"of course, we would not submit chills students' speech. That was part of [the University's] regular investigatory process.").

The Fourth Circuit's recent decision in *Abbott v. Pastides* is instructive. 900 F.3d at 170. *Abbott* involved the University of South Carolina's investigation into complaints about a joint Young Americans for Liberty–College Libertarians Free Speech Event. As part of that investigation, the university's Equal Opportunity Programs Office sent the College Libertarians' President a letter seeking "to fully discuss the

---

2019 WL 4582834, at *2. And the reports generated by the Bias Response Team in *Schlissel* provided significantly more details online. *See* Brief of Appellees Mark Schlissel et al. at 36–37, *Speech First, Inc. v. Schlissel*, —F.3d—, 2019 WL 4582834 (6th Cir. Sept. 23, 2019) (No. 18-1917), 2018 WL 6738711, at *36–37 ("Incident involved U-M Fraternity and Sorority Life organizations.").

charges as alleged . . . within the next five (5) working days." *Id*. at 165. The letter "purported to attach a 'Notice of Charge,' in addition to copies of the complaints about the Event," but "only the complaints were enclosed." *Id*. The President of the Libertarians agreed to the meeting, which lasted no more than 45 minutes. *Id.* at 166. Two weeks after that meeting, the President of the Libertarians was informed that no disciplinary action would be taken. *Id.*

As the Fourth Circuit explained, that "single, non-intrusive meeting . . . , followed two weeks later by an announcement that no further action would be taken," did not rise to the level of punishment sufficient to satisfy the credible-threat requirement for standing. *Id*. at 179. Nor was it the "kind of 'extraordinarily intrusive' process that might make self-censorship an objectively reasonable response." *Id*. That conclusion is even easier to reach here, where, unlike in *Abbott*, the CCRT has no authority to, and does not, contact or meet with alleged perpetrators.[19]

---

[19] Speech First's own cases make that conclusion clear. *See Sweezy v. New Hampshire*, 354 U.S. 234, 236–59 (1957) (state attorney general interrogated plaintiff, a teacher, in two hearings about "subversive activities," his family, and his subjective beliefs, and when he refused to answer, had a court hold him in contempt and send him to jail); *White v. Lee*, 227 F.3d 1214, 1222–25 (9th Cir. 2000) (HUD

Speech First resorts to arguing that the Court should overlook the facts and focus instead on appearances: "The [CCRT] certainly *appears* to have that power [to formally discipline students], which is all that it needs to threaten students and objectively chill their speech."  Speech First Br. 42 (citing *Bantam Books*, 372 U.S. at 67–68).  In cases like *Bantam Books*, however, the government authority deliberately represented itself as having authority over the speaker.  372 U.S. at 67–72.  The CCRT does no such thing—it is quite clear about the fact that it offers a support system, not a disciplinary process.[20]

---

officials conducted an eight-month-plus investigation after plaintiffs distributed flyers and a newsletter about zoning, offered to end the investigation if plaintiffs stopped distributing flyers, forced plaintiffs to testify about their views and public statements, lied to plaintiffs about their potential liability, and reported to newspapers that plaintiffs had "broken the law"); *Levin v. Harleston*, 966 F.2d 85, 89 (2d Cir. 1992) (university faculty created an ad hoc committee on "conduct unbecoming a member of the faculty" immediately after a professor's speech and purported to examine the factors required for the university to fire the professor).

[20]  *See* ROA.716–17 (CCRT provides support by "shar[ing] with the reporter of a perceived bias incident University resources that may be available to him or her"); ROA.717 ("The CCRT has no disciplinary authority; it is not an adjudicatory body; and it does not conduct (and has no authority to conduct) investigations into alleged student misconduct."); ROA.717 (CCRT does not "contact any student who allegedly caused an incident," and "it does not investigate a [r]eport"); ROA.719 ("no student at the University has been investigated or punished by the CCRT for engaging in speech or expression protected by the First Amendment"); *see also* ROA.514 (CCRT's website "makes clear that it is a 'non-adjudicating body' that 'support[s] reporters of bias incidents and [ ] provide[s] information regarding university resources.'") (first and last alterations in original); ROA.522 (CCRT "does not engage in investigations or punishment of any sort").

Any concerns about being punished by the CCRT are not just unsupported but also contrary to the record and therefore objectively unreasonable. *See, e.g.*, *Am. Library Ass'n v. Barr*, 956 F.2d 1178, 1193 (D.C. Cir. 1992) ("[W]hether plaintiffs have standing . . . depends on how likely it is that the government will attempt to use these provisions against them . . . and not on how much the prospect of enforcement worries them."); *Glass*, 900 F.3d at 238–39 (subjective concern is "not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm") (internal quotation marks omitted).

### 4.    Speech First's Alternative Theories Of Standing Are Foreclosed

Unable to show a credible threat of prosecution—or that its members' proposed speech would even violate the University's policies in the first place—Speech First argued below that it didn't have to proffer evidence of a credible threat because the policies' mere existence is enough. But the Supreme Court has foreclosed that argument—making clear that a plaintiff like Speech First "who alleges that the exercise of his First Amendment rights is being chilled by the mere existence, without more," of an allegedly overbroad governmental policy has failed to allege a cognizable injury. *Tatum*, 408 U.S. at 10, 14 (rejecting the

argument that "the very existence of the [government policy] produces a constitutionally impermissible chilling effect"); *see also Joint Heirs*, 629 F. App'x at 631–32 (same).  The mere existence of the challenged statute or policy is simply not enough to confer standing.

In *Carmouche*, for example, this Court explained that "a chilling of speech because of the mere existence of an allegedly vague or overbroad statute *can be* sufficient injury to support standing" ***if*** it "arise[s] from a fear of prosecution that is not 'imaginary or wholly speculative.'"  449 F.3d at 660 (emphasis added) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979)).  To support its conclusion that the threat there was not imaginary or speculative, the Court looked to a history of prior enforcement against other parties and a letter threatening enforcement against the plaintiff.  *Id.* at 660–61.  If the mere existence of the policy were enough, none of that analysis would have been necessary.

Implicitly acknowledging it cannot satisfy the governing standard, Speech First puts forward another standard—but succeeds only in underscoring its lack of standing.  Speech First contends that courts can "assume a credible threat of prosecution in the absence of compelling

contrary evidence" when dealing with policies that restrict expression. Speech First Br. 25 (quoting *Rangra v. Brown*, 566 F.3d 515, 519 (5th Cir. 2009)). As an initial matter, *Rangra* was vacated by the en banc court. *See* 576 F.3d 531 (5th Cir. 2009) (en banc). Regardless, it does not help Speech First. The University has put forward ample "compelling contrary evidence"—unrebutted testimony about its track record of protecting students' free speech rights when they speak out on some of the very topics at issue.

Among the topics Speech First says its members want to speak out about are their support for Justice Kavanaugh and their opposition to affirmative action. ROA.42–44. Over the last several years, University students and organizations have held events on campus at which students expressed those same views. In each case, the University helped ensure that the events would go forward—and it certainly did not investigate, much less impose discipline, on any student who expressed conservative views at the events. ROA.633 (pro-Kavanaugh event); ROA.690–91, 708 (affirmative action bake sale); ROA.692, 708, 728–29 (Charlie Kirk event).

In fact, the only students who *were* disciplined in connection with these events were students who tried to disrupt them or harass the speakers.  ROA.707–08, 728.  Where, as here, "the University has made manifest its intent to *allow* speech even when it might or does cause offense," there is no credible threat of future enforcement.  *Abbott*, 900 F.3d at 177.[21]  And because "plaintiffs 'do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible,' they do not allege a dispute susceptible to resolution by a federal court."  *Babbitt*, 442 U.S. at 298–99 (quoting *Younger v. Harris*, 401 U.S. 37, 42 (1971)).

Instead of rebutting these facts, Speech First argues (at 29–31) that the district court should not have considered the declarations that the University used to prove them.  But Speech First's objections proceed from the faulty premise that the mere existence of an allegedly vague or overbroad statute is enough, by itself, to constitute a credible threat of enforcement.  That premise is wrong.  Speech First also says standing

---

[21]  Moreover, any presumption of a credible threat of enforcement would not apply where, as here, the policy "by its terms" does not appear to apply "to the plaintiffs' anticipated speech" and "contains multiple statements exempting the kind of academic speech in which the plaintiffs intend to engage."  *Abbott*, 900 F.3d at 178 n.9.

must be determined as of the time the complaint was filed, and that is true—but the declarations describe facts and circumstances that existed at that time or before.  The fact that the declarations were executed after the litigation began does not make the facts they contain irrelevant to jurisdiction at the time of filing—if it did, no witness could ever testify to jurisdictional facts.  And Speech First's credibility objection comes too late.  The district court credited the testimony in the declarations and made findings based upon it.  "Such a credibility determination cannot be clear error."  *United States v. Landaverde-Castillo*, 731 F. App'x 293, 297 (5th Cir. 2018).

## B.    The Speech in Which Speech First's Members Wish To Engage Is Not Prohibited By The University's Policies

The absence of a credible threat of enforcement is not surprising, given that none of the speech at issue is prohibited.  *See Susan B. Anthony List*, 573 U.S. at 162.  Far from it, the University's policies expressly protect and encourage it.[22]

---

[22]  *E.g.*, ROA.188 (Institutional Rules) ("To make an argument for or against the substance of any political, religious, philosophical, ideological, or academic idea is not verbal harassment, even if some listeners are offended by the argument or idea."); ROA.204 (Use Policy) ("As an academic institution, we place great value on freedom of thought and expression. . . .  We do not punish or prevent expression that may be offensive but that violates no specific law or university regulation."); ROA.262–63 (Residence Hall Manual) ("[T]he University encourages all members of its community

47

To start, the Institutional Rules make clear that "[t]o make an argument for or against the substance of any political, religious, philosophical, ideological, or academic idea is not verbal harassment, even if some listeners are offended by the argument or idea." ROA.188. This provision excludes from the definition of verbal harassment every topic about which Speech First's members want to speak. *See* ROA.42–44; ROA.181. And it is cross-referenced by all of the other challenged policies (which are now moot) as the operative, governing provision. ROA.220, 243 (Residence Manual); ROA.202 (Use Policy); ROA.297–98 (CCRT).[23]

---

to support the freedom of speech. Students are free to communicate their ideas vigorously; those who are exposed to such ideas, whether in the classroom, the grounds of the campus, or in the residence halls, should tolerate the expression even of views that they find offensive or unacceptable. Students who passionately disagree about important matters should be able to confront one another civilly and to recognize that, despite profound differences, they are engaged in the common pursuit of truth. The best response to offensive speech is more free speech.").

[23] Speech First contends (at 46) that this exclusion is unconstitutionally vague because it only applies to speech that is "necessary to the expression of" an argument for or against the substance of certain ideas, but the only case Speech First cites to support its contention—*Wollschlaeger v. Governor*—is inapposite. 848 F.3d 1293, 1303 (11th Cir. 2017) (en banc). The problem with the statute at issue in *Wollschlaeger*—which prohibited "unnecessary harassment"—was that its use of "necessary" as a modifier created an incoherent concept (there is no such thing as "necessary harassment"). *Id.* at 1319, 1321–22. By contrast, the phrase "necessary to the expression of [an idea]" is entirely coherent: It straightforwardly conveys that the exclusion applies to speech that conveys the substance of an idea, but not to any speech on unrelated topics that might happen to occur at the same time.

Consistent with the plain text of these policies, the Dean of Students testified without contradiction that "[s]tudent discipline is administered only for violations of the Institutional Rules." ROA.641–42.[24] Her testimony confirms that, as relevant here, student speech at the University is "arguably proscribed" only if that speech violates the Institutional Rules. *See Susan B. Anthony List*, 573 U.S. at 163. Because the Institutional Rules expressly protect the speech in which Speech First's student members want to engage, Speech First cannot carry its burden to show that this speech is actually *prohibited* by any of the challenged policies.[25]

Perhaps recognizing that the language of the Institutional Rules forecloses its argument, Speech First falls back on the argument that "[i]n the eyes of many," various statements on certain political, religious,

---

[24] *See* ROA.204 (Use Policy) ("Ideally, we would like all those associated with the university to exercise their freedoms in a mature, responsible, and respectful manner, and we encourage them to do so. *We do not punish or prevent expression that may be offensive but that violates no specific law or university regulation.*") (emphasis added); ROA.243 (Residence Hall Manual) ("Residents who are suspected to have engaged in harassment *as defined in the Institutional Rules* will be referred to the Dean of Students for possible disciplinary action.") (emphasis added).

[25] The University's definition of "verbal harassment" is narrower than the one confronted by the Sixth Circuit in *Schlissel*, which encompassed the dictionary definitions of both "harassing" and "bullying." 2019 WL 4582834, at *1.

philosophical, ideological, and academic topics could be construed as verbal harassment. Speech First Br. 26. Again, the relevant inquiry is whether the policy actually prohibits the speech in question—not whether some might mistakenly believe it does. *See Zanders v. Swanson*, 573 F.3d 591, 594 (8th Cir. 2009) (it is "too speculative for standing purposes to allege that this [policy] *could* be manipulated"). As Speech First correctly recognized below, to determine whether "the policies arguably apply to our members' planned speech," a court must "look at the policies themselves." ROA.543; *see also Cruz*, 849 F.3d at 599 ("Here, standing is reduced to a question of statutory interpretation.").

Looking at the policies confirms that "the speech [Speech First] claim[s] is chilled by the [policies] . . . is not the target of the [policies'] prohibition," and therefore Speech First cannot carry its burden of showing that any chill is objectively reasonable. *Zanders*, 573 F.3d at 594. Self-censorship based on a fear that the University will somehow misuse or misapply the policies is not constitutionally cognizable. *Id.*; *see also Blum*, 744 F.3d at 802. And there is no evidence or even a hint that it has ever done so in the past.

For all of these reasons, Speech First does not have standing to bring a pre-enforcement facial challenge against the University.[26]

## III.   The District Court Properly Dismissed The Complaint

Once the district court determined that Speech First had not carried its burden on standing, it correctly dismissed the complaint without prejudice.[27]  As Speech First concedes, it is not error for a district court to dismiss "on jurisdictional grounds" without granting leave to amend if "the defect is clearly incurable."  Speech First Br. 50 (quotation omitted); *accord Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002).  Indeed, dismissal is *required*

---

[26]   If this Court finds that Speech First has standing, in no event should the Court take the extraordinary step of remanding this case to the district court with instructions to enter a preliminary injunction, as Speech First requests (at 21).  As Speech First concedes, the trial court has not addressed a question essential for granting a preliminary injunction—whether Speech First is likely to succeed on the merits of its claims.  *Id.* at 45; *see also* ROA.523.  As "'a court of review, not of first view,'" this Court should give the district court the opportunity to address the merits of the preliminary-injunction motion in the first instance.  *Kiyemba v. Obama*, 559 U.S. 131, 131 (2010) (per curiam) (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005)).

[27]   Speech First's contention that the district court granted "a total dismissal on the merits" (at 48) is a misnomer—a dismissal without prejudice for lack of standing is jurisdictional, not "on the merits."  That also explains why Speech First's reliance on *Shockley v. Jones* (at 50) is misplaced.  823 F.2d 1068, 1073 (7th Cir. 1987) ("a dismissal for *failure to state a claim* is a *decision on the merits* with full res judicata effect" but a "dismissal for lack of subject matter jurisdiction is not a decision on the merits; 'its res judicata effect is limited to the question of jurisdiction'") (emphases added).

under Rule 12(h)(3) whenever the court determines it lacks subject-matter jurisdiction. *See* Fed. R. Civ. P. 12(h)(3) (the district court "must dismiss the action" if it lacks subject matter jurisdiction).

That is the case here. Whether the speech in which Speech First's members wish to engage is prohibited by the University's policies depends entirely on what those policies say. All three policies and the CCRT were before the district court, which considered each thoroughly. There is nothing Speech First could have alleged in an amended complaint that would have changed the language of the policies or expanded the scope of what they prohibit. *Cf. Cruz*, 849 F.3d at 599 & n.7 ("Here, standing is reduced to a question of statutory interpretation. . . . Although concluding that [the statute] applies to plaintiffs, the [trial] court noted that plaintiffs would lack standing if defendants' interpretation of the statute is correct.").

Nor was the district court's dismissal of Speech First's complaint "sua sponte," as Speech First contends. Speech First Br. 18. It was the result of Speech First's failure to carry its burden to plead and prove standing—a failure the University raised in its very first responsive filing, ROA.447–54, and which was the primary focus of the preliminary-

injunction hearing. *See* ROA.533, 539–43. Under these circumstances, "it long has been the practice of both trial and appellate federal courts to dismiss the entire action when the deficiency is brought to their attention," such as through briefing on a motion for preliminary injunction. 11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2950 (3d ed. 2019); *see*, *e.g.*, *Okpalobi v. Foster*, 244 F.3d 405, 409 (5th Cir. 2001) (en banc) (reversing grant of preliminary injunction and remanding "for entry of a judgment of dismissal" where the court "lack[ed] Article III jurisdiction to decide [the] case").

Speech First contends that "standing should have been evaluated under the motion to dismiss standard." Speech First Br. 49 (quotation and ellipsis omitted). But there is no difference between the applicable motion-to-dismiss standard and the standard the district court applied. Because standing is an aspect of subject-matter jurisdiction, motions to dismiss for lack of standing are decided under Federal Rule of Civil Procedure 12(b)(1). *E.g.*, *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

Unlike a Rule 12(b)(6) motion, where the district court must limit its analysis to the face of the complaint and accept the complaint's

allegations as true, a Rule 12(b)(1) motion allows the district court to consider materials outside the complaint, "weigh the evidence," and "resolve factual disputes." *Flores v. Pompeo*, 936 F.3d 273, 276 (5th Cir. 2019) (quoting *Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 494 (5th Cir. 2005)). The district court's dismissal of Speech First's complaint was consistent with that standard.[28]

## CONCLUSION

For the foregoing reasons, the judgment dismissing the complaint without prejudice should be affirmed.

---

[28] Speech First's own cases reject its suggestion that the district court should "adjudicate Article III standing *after* . . . the parties conduct discovery and file motions for summary judgment" (at 50). *See Shockley*, 823 F.2d at 1070 n.1 ("The question of jurisdiction is *therefore inappropriate for summary judgment*.") (emphasis added).

Dated:        October 9, 2019          Respectfully submitted,


                                        /s/ *Allyson N. Ho*
                                       Allyson N. Ho
Charles L. Babcock                     Russell H. Falconer
Joel R. Glover                         Kathryn M. Cherry
JACKSON WALKER LLP                     GIBSON, DUNN & CRUTCHER LLP
1401 McKinney Street, Suite 1900       2100 McKinney Avenue, Suite 1100
Houston, Texas  77010                  Dallas, Texas  75201
Telephone:  (713) 752-4200             Telephone:  (214) 698-3100
Facsimile:  (713) 752-4221             Facsimile:  (214) 571-2900
*cbabcock@jw.com*                       *aho@gibsondunn.com*
*jglover@jw.com*                        *rfalconer@gibsondunn.com*
                                       *kcherry@gibsondunn.com*

Adam W. Aston
JACKSON WALKER LLP
100 Congress Avenue, Suite 1100
Austin, Texas  78701
Telephone:  (512) 236-2000
Facsimile:  (512) 236-2002
*aaston@jw.com*


                *Counsel for Defendant–Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that, on October 11, 2019, a true and correct copy of the foregoing brief was served via the Court's CM/ECF system or via electronic mail on all counsel of record.

/s/ Allyson N. Ho
Allyson N. Ho

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the typeface requirements of Rule 32(a)(5) and the typestyle requirements of Rule 32(a)(6) because this brief was prepared in 14-point New Century Schoolbook, a proportionally spaced typeface, using Microsoft Word 2016. This brief complies with the type-volume limitation of Rule 32(a)(7)(B) because it contains 11,242 words, excluding the parts exempted from under Rule 32(f).

/s/ Allyson N. Ho
Allyson N. Ho